**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

STEVEN IVANKOVICH,

Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP, and
JOSEPH SEINITZ,

Defendants.
______________________________________ /

Case No. 1:25-cv-25402-KMW

Hon. Judge Kathleen M. Williams

Magistrate Judge Enjolique A. Lett

**DEFENDANT'S MOTION TO COMPEL DEPOSITION TESTIMONY**
**OF NON-PARTY WITNESS DR. OLGA IVANKOVICH**

Defendants SCHILLER, DUCANTO & FLECK, LLP ("SDF") and JOSEPH SEINITZ (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 37, hereby move this honorable Court for an order requiring non-party witness, Dr. Olga Ivankovich, to answer certain questions which she refused to answer at her deposition in pending litigation in the Southern District of Florida. In support thereof, Defendants state as follows:

**FACTUAL BACKGROUND**

1. Defendants are parties to pending litigation brought by Steven Ivankovich ("Steven") in Case No. 1:25-cv-2540 in the U.S. District Court for the Southern District of Florida (the "Florida Litigation"). On August 12, 2026, non-party witness, Dr. Olga Ivankovich ("Dr. Ivankovich"), was deposed pursuant to a subpoena issued by Defendants. At her deposition, Dr. Ivankovich refused to answer numerous questions based on various unfounded objections.

2. Because Dr. Ivankovich was in Illinois at the time her deposition was taken, Federal Rule of Civil Procedure 37(a)(2) required this Motion to be filed in this district, rather than in the Southern District of Florida where the Florida Litigation is taking place.

3. In order to understand the basis for Defendants' position in this Motion to Compel, a brief background of the Florida Litigation is necessary.

4. Since October 2021, Steven has been in an active divorce proceeding in Chicago with his wife, Jeanette Ivankovich, who is being represented by SDF, an Illinois law firm that focuses on family law. In the divorce proceeding, the trial court has remarked its astonishment at how Steven had engaged in a campaign to "starve [Jeanette] out to get her to the point where she'll take crumbs just to settle the case so she can survive," all whilst Steven has simultaneously lived a "lavish lifestyle" for himself.

5. As part of that tactic, Steven willfully violated multiple court orders, resulting in two body attachments calling for his arrest. The body attachment orders arose out of Steven's failure to pay Jeanette court-ordered child support and legal fees. Steven has not contested the validity of either body attachment order. In December 2024, the divorce court entered an order authorizing the Cook County Sheriff's Department to enter the two body attachment orders into the National Crime Information Center (NCIC) system.

6. On March 31, 2025, SDF attorney, Tanya Stanish, received an unsolicited email from co-defendant Joseph Seinitz ("Seinitz") asking that she contact him. Seinitz had been employed as the director of security for Steven Ivankovich's family (the "Ivankovich Family") since at least 2021. At the time he reached out to Stanish, Seinitz was still employed by the Ivankovich Family. However, by that point, he could no longer sit back and watch as Steven did everything in his power to destroy Jeanette, his two minor children, and Jeanette's attorneys. Fed

up with Steven's sickening behavior, Seinitz wanted to assist SDF in its efforts to obtain justice in the divorce proceeding.

7. To that end, in late April 2025, while Steven was actively evading the outstanding body attachment orders, Seinitz informed Stanish that Steven was present at a house in Islamorada, Florida, that was being leased by the Ivankovich Family. Seinitz learned Steven's location through a security camera that had been previously installed for security at the property. SDF then used that information to inform local police of Steven's whereabouts.

8. As a result, on April 28, 2025, Steven was arrested by the Monroe County Sheriff's Office pursuant to the outstanding body attachment orders. Steven could have immediately effectuated his release from jail (or prevented his incarceration altogether) by paying the purge amount of $672,559.44. Rather than pay the purge amount, Plaintiff instead chose to contest his incarceration, not on the ground that the body attachment orders were unlawful but that he could not be extradited to Illinois.

9. Steven was incarcerated for 35 days, until a state court judge entered an order directing Steven's release from custody after confirming that the State of Illinois did not intend to extradite Steven to Illinois.

10. Based on these events, Steven filed suit against SDF and Seinitz asserting ten different causes of action. A copy of Steven's operative First Amended Complaint is attached as **Exhibit 1**. In answers to interrogatories, Steven has disclosed that as a result of his incarceration, he seeks non-economic damages for "emotional distress, loss of liberty, humiliation, and mental anguish." Steven also seeks damages for attorneys' fees and other expenses he incurred securing his release from jail.

*Relevance of Steven's Finances and Prior Court Ruling Regarding Same*

11. In the Florida Litigation, Defendants issued multiple written discovery requests to Steven regarding his financial condition. Steven objected, arguing that his financial condition was irrelevant to any claims or defenses in the Florida Litigation. Accordingly, on April 13, 2026, Defendants filed a motion to compel, arguing that Plaintiff's financial ability to pay off the purge amount (rather than sit in jail and contest his incarceration on extradition grounds) is relevant under Florida's doctrine of avoidable consequences. *See* Motion to Compel, **Exhibit 2**.[1]

12. "The doctrine of avoidable consequences, which is also somewhat inaccurately identified as the 'duty to mitigate' damages, commonly applies in contract and tort actions." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). "The doctrine simply prevents a party from recovering those damages inflicted by a wrongdoer that the injured party could have reasonably avoided." *Id*. Under the doctrine, "the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care,' without requiring undue effort or expense." *Id*. (quoting *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So. 2d 1011, 1014 (Fla. Dist. Ct. App. 1984)).

13. Defendants further argued that there is substantial evidence that Steven had the necessary funds to pay the purge amount, rather than incur legal fees and supposed non-economic damages sitting in jail and contesting his incarceration. For example, the Illinois divorce court has ruled, amongst other things, that: (a) Plaintiff has transferred over $60 million from various business accounts of entities which were found to be Plaintiff's alter ego; and (b) Plaintiff has engaged in a campaign to "starve [his wife] out to get her to the point where she'll take crumbs

[1] Under the local rules of the Southern District of Florida, Defendants' motion to compel was submitted in the form of a joint discovery motion, which allowed both sides to assert their positions on the issues raised in the motion to compel.

just to settle the case so she can survive," all whilst Steven has simultaneously lived a "lavish lifestyle" for himself. Similarly, an Illinois federal court has recently held that Steven controlled and expended millions of dollars for his own benefit, despite Steven's claims that the money did not belong to him. Even Steven himself once completed a personal financial statement in August 2020 claiming a net worth of over $55 million.

14. Yet in the Florida Litigation, Steven has refused to admit that he had the financial ability to pay the purge amount. Instead, Steven has proclaimed that he has zero assets and zero income and that any supposed wealth in his family belongs to his parents.

15. In light of these facts, on April 16, 2026, the Magistrate Judge in the Florida Litigation granted Defendants' motion to compel, finding that that the various discovery requests propounded by Defendants regarding Steven's financial condition sought relevant information for purposes of discovery. *See* 4/16/2026 Order, **Exhibit 3**. Thus, the issue of whether Steven's financial condition is relevant for discovery purposes in the Florida Litigation has already been adjudicated in favor of Defendants.

*Deposition of Dr. Ivankovich*

16. On August 12, 2026, the parties conducted the deposition of Dr. Ivankovich, Steven's mother, pursuant to a subpoena issued by Defendants. A copy of Dr. Ivankovich's deposition transcript is attached as **Exhibit 4**.

17. At her deposition, Dr. Ivankovich (who was being represented by attorney Jeffrey Heftman) was asked various questions relating to Steven's financial condition and his ability to purge himself out of jail, whether through his own funds or funds from his parents. Throughout the deposition, Dr. Ivankovich's attorney repeatedly interjected and instructed his client not to answer. The questions at issue in this Motion are detailed below.

## ARGUMENT

18. Parties are permitted to obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" Fed. R. Civ. P. 26(b)(1). The test for relevance "in the discovery area is an extremely broad one." *AM Int'l Inc. v. Eastman Kodak Co.*, 100 F.R.D. 255, 257 (N.D. Ill.1981). A request for discovery "should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Id.* (quoting 8 Wright and Miller, Federal Practice and Procedure § 2008 (1970)).

19. As detailed below, the questions posed of Dr. Ivankovich sought relevant, non-privileged information. Dr. Ivankovich should therefore be ordered to sit for a second deposition and be instructed to answer the questions at issue without objection.

### I. Questions Concerning Whether Dr. Ivankovich Would Have Required Steven to Pay Her Back if She Had Paid the Purge Amount are Relevant

20. At her deposition, Dr. Ivankovich testified that she herself had the financial wherewithal to pay the $672,559.41 purge amount. *See* Ex. 4, Dr. Ivankovich Dep., at 28:16-19. She also testified that whenever Steven has ever needed money, she has given it to him. *Id.* at 22:19-24. All Steven would have to do is ask. *Id.* at 24:7-9.

21. Dr. Ivankovich was then asked if she conditions her financial assistance to Steven—whenever he asks for it—to any repayment obligations. Dr. Ivankovich refused to answer. Instead, her attorney interjected and instructed Dr. Ivankovich not to answer on the ground that the questions were not relevant to the Florida Litigation:

> **Q: Is it fair to say that you and Steven have had a continuous relationship throughout his life?**
> A: Yes.
> **Q: And whenever Steven needs money, he can get it from you. Correct?**
> A: That is correct.
> **Q: And whenever he would need money, you generally wouldn't ask him to pay it back. Correct?**

> MR. HEFTMAN: Objection. I'm gonna instruct the witness not to answer. It's beyond the scope of this deposition. It's beyond the scope of this case. It's not relevant. And it's fishing for purposes of the domestic relations action.
>
> ***
>
> **Q: And all Steven would have to do is ask you for money and you would give it to him. Correct?**
> A: Correct.
> **Q: And you wouldn't condition giving him the money on him having to pay you back. Correct?**
> MR. HEFTMAN: Objection. Asked and answered. Not relevant to this litigation. Interposed for purposes of harassment and previously the subject of an instruction not to answer.

*See* Ex. 4, Dr. Ivankovich Dep., at 22:19-23:7; 24:7-15.

22. These questions are clearly relevant to the Florida Litigation. If Steven had an endless source of funding available to him to have paid the purge amount without incurring any debt or obligation, then that evidence would support Defendants' defense under the Florida's doctrine of avoidable consequences. In other words, if Steven could have availed himself of these funds without incurring any additional obligations, then the injuries he allegedly sustained as a result of his incarceration "could have [been] reasonably avoided." *Sys. Components Corp.*, 14 So. 3d at 982.

## II. Identity of Attorney that Allegedly Provided Advice to Dr. Ivankovich is Not Privileged and, Regardless, Dr. Ivankovich Waived the Attorney-Client Privilege to the Extent it Applies

23. Despite testifying that she gave money to Steven whenever he needed it and would continue to do so, Dr. Ivankovich claimed that she never offered to purge Steven out of jail. In attempting to explain this otherwise non-credible assertion, Dr. Ivankovich testified that she refused to pay the purge amount because she was "advised" that there was no "guarantee that after paying a bond, that Steven would not be reincarcerated again." *See* Ex. 4, Dr. Ivankovich Dep., at 29:20-23. Naturally, defense counsel asked who supposedly provided this guidance. Dr.

Ivankovich, however, refused to disclose the identity of this supposed individual, claiming that the person's identity is protected by the attorney-client privilege. The relevant testimony is as follows:

> **Q: While Steven was in jail, did you understand that the Florida Court set a bond amount that would have allowed Steven to be released from jail if he paid the amount or if someone paid it on his behalf?**
> A: Yes.
>
> ***
>
> **Q: Okay. And I'll zoom in even more here on this sentence that says, "Bond is set in this case at the amount of $672,559.41, cash or surety." Do you see that?**
> A. Never seen it.
> **Q: Okay. Were you aware, while Steven was in jail, that this was the amount that could be paid to have him released from jail?**
> A: I did not.
> **Q: Okay. Did you in late April, slash, early May of 2025 have the financial ability to pay off this roughly $670,000 amount?**
> A: Naturally I did.
> **Q: Okay. And let's assume the amount was higher. Let's assume it was closer to $1.5 million. If that was the number, did you have the financial ability to pay that amount?**
> A: I did.
> **Q: Did you ever offer to pay the amount necessary to have Steven released from jail?**
> A: No.
> **Q: Did Steven ever ask you to pay that – to make that payment?**
> A: No.
> **Q: Okay. And you testified that you did not offer to pay that -- the amount necessary to have Steven released from jail. My question following up on that is, why didn't you make that offer?**
> A: <u>There was no -- any -- I was advised that there was no -- any guarantee that after paying a bond, that Steven would not be reincarcerated again</u>.
> **Q: And who gave you that guidance?**
> A: My advisors.
> **Q: And who – what's the name of your advisor?**
> MR. HEFTMAN: To the extent that the advice that you received was from an attorney, I'm gonna instruct you not to answer.
> THE WITNESS: I refrain.
> MR. JALALPOUR: Well, Mr. Heftman, she's just disclosed the guidance. So to the extent there was any attorney-client privilege, it has now been waived. And so I think we're entitled to know who provided that guidance.
> MR. HEFTMAN: I'm gonna instruct the witness not to answer, Counsel.

*See* Ex. 4, Dr. Ivankovich Dep., at 27:4-12; 28:5-30:15 (emphasis added).

24. Dr. Ivankovich's assertion of the attorney-client privilege is nonsensical for two reasons. First, the attorney-client privilege does not protect the *identity* of the attorney who

supposedly provided legal advice to the client, as such application of the privilege would not advance its purpose. "[S]ince the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). "Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* Thus, the privilege does not extend to protect identity of the attorney since such protection would not advance the purpose of the privilege. *See, e.g., Goddard v. United States*, 131 F.2d 220, 221 (5th Cir. 1942) (finding that identity of attorney was not privileged); *see also United States v. BDO Seidman*, 337 F.3d 802, 811 (7th Cir. 2003) (finding that with respect to the identity of the *client*, "ordinarily the identity of a client does not come within the scope of the privilege").

25. Second, even if the identity of the attorney is somehow privileged, Dr. Ivankovich waived the privilege by disclosing the contents of the supposed advice the attorney provided. "Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege." *Powers v. Chicago Transit Auth.*, 890 F.2d 1355, 1359 (7th Cir. 1989). By disclosing the supposed advice she received from an attorney, Dr. Ivankovich waived any privilege with respect to the identity of the attorney. *See, e.g., Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 477 (N.D. Ill. 2002) (finding that client waived the attorney-client privilege when it voluntarily disclosed a letter from its attorney to an opposing party during a settlement meeting).

## III. Dr. Ivankovich's Knowledge Concerning Various Financial Documents Relating to Steven's Financial Condition is Relevant

26. As detailed above, there is substantial evidence that despite claiming indigence, Steven is incredibly wealthy. Moreover, there is substantial evidence that Steven has attempted to hide his wealth through sham transactions purportedly involving his parents.

27. Dr. Ivankovich was asked about one of those transactions: a "Contribution Pledge and Security Agreement" executed by Steven *after* his wife filed for divorce. *See* Contribution Pledge and Security Agreement, **Exhibit 5**. In that agreement, Steven purported to "pledge and grant" all of his membership interests in various multi-million dollar LLC's to a Cayman Islands company called North American Property Ventures Ltd. The agreement asserts that Steven was giving away all of his membership interests due to over $100 million in outstanding loans advanced to Steven by his parents. *Id*. at p. 1.

28. Despite the clear relevance of this document to the Florida Litigation, Dr. Ivankovich refused to answer numerous questions about the agreement, including questions about the existence of supposed documents supporting the alleged $100 million-plus in loans from Steven's parents to Steven. *See* Ex. 4, Dr. Ivankovich Dep., at 91:7-8; 92:16-17. Dr. Ivankovich's attorney objected, claiming that the questions were not relevant to the Florida Litigation but rather intended "for purposes of the domestic relations action. *Id.* at 91:10-13. The objection is unfounded. If the Contribution Pledge and Security Agreement is a sham document designed to hide Steven's wealth, then Dr. Ivankovich's testimony regarding the transaction is relevant to Defendants' defense that Steven could have easily paid the purge amount to avoid his incarceration. That such information may also be relevant to the divorce proceeding between Steven and his wife does not undermine this fact.

WHEREFORE, Defendants, SCHILLER, DUCANTO & FLECK, LLP and JOSEPH SEINITZ, request that this Honorable Court enter an order:

(1) Granting this Motion to Compel;

(2) Requiring Dr. Olga Ivankovich to sit for a second deposition within fourteen (14) days in-person at a location agreeable to the parties and the witness;

(3) Requiring Dr. Olga Ivankovich to answer questions at her second deposition as to the topics described in this Motion to Compel, including but not limited to the questions posed at the following lines of her first deposition: 23:1-14; 24:10-11; 30:4:8; 45: 9-12; 91:7-8; 92:16-17; 138:2-5; 144:22-24; and

(4) Granting any other relief the Court deems just.

**CERTIFICATION OF CONFERRAL**

The undersigned certifies that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated: September 30, 2026

Respectfully submitted,

Defendants SCHILLER, DUCANTO & FLECK, LLP and JOSEPH SEINITZ

By: /s/ *Ramses Jalalpour*
One of Their Attorneys

Ramses Jalalpour (ARDC: 6313128)
KONICK & DILLON, P.C.
70 W. Madison St., Suite 2060
Chicago, IL 60602
Ph: 630.672.3728
rj@konicekdillonlaw.com